Pages 1 - 39

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )  NO. CR. 14-00120 EMC
   vs.                         )
                               )
EDUARDO ALVAREZ, *et al.*,     )
                               )  San Francisco, California
          Defendants.          )
_____)
                               Wednesday, June 11, 2014


                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
**For Plaintiff:**          Melinda Haag
                            United States Attorney
                            450 Golden Gate Avenue, 11th Floor
                            San Francisco, CA  94102
                            (415) 436-7249
                            (415) 436-7234 (fax)
                    BY:  **ANDREW M. SCOBLE**
                         **NATALIE LEE**


**For Defendant**           Law Office of Erik G. Babcock
**Eduardo Alvarez:**        717 Washington Street, 2nd Floor
                            Oakland, CA  94607
                            (510) 452-8400
                            (510) 452-8405 (fax)
                    BY:  **ERIK G. BABCOCK**


**For Defendant**           Law Offices of Hallinan & Wine
**Elias Chavez:**           345 Franklin Street
                            San Francisco, CA  94102
                            (415) 621-2400
                            (415) 575-9930 (fax)
                    BY:  **KENNETH HOWARD WINE**


Reported By:  Lydia Zinn, CSR No. 9223, Official Reporter

```
 1   APPEARANCES CONTINUED
     For Defendant          Law Offices of Martin Sabelli
 2   Luis Cid-Salinas:      Four Embarcadero Center, 17th Floor
                            San Francisco, CA  94111
 3                          (415) 955-9103
                            (415) 520-5810 (fax)
 4                     BY:  MARTIN ANTONIO SABELLI

 5   For Defendant          Swanson & McNamara, LLP
     Ignacio Cruz:          300 Montgomery Street, Suite 1100
 6                          San Francisco, CA  94104
                            (4150 477-3800
 7                          (415) 477-9010 (fax)
                       BY:  NATHAN KENNETH BAYS
 8
     For Defendants         Law Offices of Martin Sabelli
 9   Juan Carlos            Four Embarcadero Center, 17th Floor
     Garcia-Gomez;          San Francisco, CA  94111
10   Jairo Hernandez:       (415) 955-9103
                            (415) 520-5810 (fax)
11                     BY:  MARTIN ANTONIO SABELLI

12   For Defendants         Law Offices of William L. Osterhoudt
     Juan Carlos            135 Belvedere Street
13   Garcia-Gomez;          San Francisco, California  94117-3915
     Jairo Hernandez:       (415) 664-4600
14                          (415) 664-4691 (fax)
                       BY:  WILLIAM L. OSTERHOUDT
15
     For Defendant          Jennifer Lynn Naegele, Attorney at Law
16   Orlando Carlos         P.O. Box 12375
     Hernandez:             San Francisco, CA  94122
17                          (415) 519-9116
                       BY:  JENNIFER LYNN NAEGELE
18
     For Defendant          Bonjour Thorman Baray & Billingsley
19   Jusef Nathan:          24301 Southland Drive, Suite 312
                            Hayward, CA  94545
20                          (510) 785-8400
                            (510) 670-0955 (fax)
21                     BY:  CAMELLIA BARAY

22   For Defendant          Orrick, Herrington & Sutcliffe
     Rogelio Real:          The Orrick Building
23                          405 Howard Street
                            San Francisco, California  94105-2669
24                          (415) 773-5692
                            (415) 773-5759 (fax)
25                     BY:  ROLAND CHANG
```

```
 1   APPEARANCES CONTINUED
     For Defendant          Law Offices of Tamor & Tamor
 2   Mario Serrano:         The Sierra Building
                            311 Oak Street, Suite 108
 3                          Oakland, CA  94607
                            (415) 655-1969
 4                    BY:   RICHARD ALAN TAMOR

 5   For Defendant          Law Office of Diana L. Weiss
     Alberto Torres:        1563 Solano Avenue, #223
 6                          Berkeley, CA  94707
                            (510) 847-1012
 7                          (510) 525-1321 (fax)
                      BY:   DIANA L. WEISS
 8
     For Defendant          Office of the Federal Public Defender
 9   Carlos Vasquez:        19th Floor, Federal Building
                            450 Golden Gate Avenue, Room 19-6884
10                          San Francisco, CA  94102
                            (415) 436-7700
11                          (415) 436-7706 (fax)
                      BY:   CANDIS LEA MITCHELL
12
     For Defendant          Coleman, Balogh & Scott LLP
13   Weston Venegas:        235 Montgomery Street, Suite 1070
                            San Francisco, CA  94104
14                          (415) 391-0440
                            (415) 373-3901 (fax)
15                    BY:   ETHAN ATTICUS BALOGH

16   For Defendant          Morrison & Foerster
     Michael Viera:         425 Market Street
17                          San Francisco, CA 94105-2482
                            (415) 268-7328
18                          (415) 268-7522 (fax)
                      BY:   GEORGE C. HARRIS
19

20   ALSO PRESENT:   Melinda Basker, Spanish-language Interpreter

21

22

23

24

25
```

1    **THE CLERK:**  Please be seated.  Calling Case

2  CR. 14-0120, U.S.A. versus Eduardo Alvarez, Elias Chavez,

3  Luis Cid-Cruz [sic], Ignacio Cruz, Juan Carlos Garcia-Gomez,

4  Jairo Hernandez, Orlando Carlos Hernandez, Jusef Nathan,

5  Rogelio Real, Mario Serrano, Alberto Torres, Carlos Vasquez,

6  Weston Venegas, and Michael Viera.

7    Counsel, please come to the podium and state your name for

8  the record.

9    **MS. LEE:**  Good afternoon, Your Honor.  Natalie Lee

10  and Andy Scoble, on behalf of the United States.

11    **THE COURT:**  All right.  Thank you, Ms. Lee.

12    **MR. BALOGH:**  Good afternoon, Judge Chen.  My name is

13  Ethan Balogh.  I represent Mr. Weston Venegas.  He's in the

14  front row, in the custody of the United States Marshal.

15    **THE COURT:**  All right.  Good afternoon, Mr. Venegas.

16    **MR. TAMOR:**  Good afternoon, Your Honor.

17  Richard Tamor, appearing formally with Mr. Mario Serrano.  He

18  present, in custody, and just stood up for you.

19    **THE COURT:**  All right.  Thank you, Mr. Serrano.

20    **MR. BABCOCK:**  Good afternoon, Your Honor.

21  Erik Babcock, for Eduardo Alvarez, who is present, in custody.

22    **THE COURT:**  All right.  Thank you.

23    And good afternoon, Mr. Alvarez.

24    **MS. NAEGELE:**  Good afternoon, Your Honor.

25  Jennifer Naegele.  I'm appearing for Harris Taback, for

1  Orlando Hernandez, who is present and in custody.

2          **THE COURT:**  Thank you.

3      And good afternoon, Mr. Hernandez.

4          **MR. WEINBERG:**  Good afternoon, Your Honor.  Ken Wine,

5  for Elias Chavez, who is present, standing, in custody.

6          **THE COURT:**  All right.  Thank you, Mr. Chavez.

7          **MS. MITCHELL:**  Good afternoon, Your Honor.

8  Candis Mitchell, Federal Public Defender's office, on behalf

9  Mr. Carlos Vasquez, who's now standing before the Court, in

10  custody.

11          **THE COURT:**  All right.  Thank you, Mr. Vasquez.

12          **MR. HARRIS:**  Good afternoon, Your Honor.

13  George Harris, on behalf of Michael Viera, who is present.

14  He's in the back row, standing now.

15          **THE COURT:**  All right.  Thank you, Mr. Viera.

16          **MS. WEISS:**  Good afternoon, Your Honor.  Diana Weiss,

17  appearing on behalf of Alberto Torres, who is in the front row,

18  standing, and in the custody of the Marshals.

19          **THE COURT:**  All right.  Good afternoon, Mr. Torres.

20          **MR. CHANG:**  Good afternoon, Your Honor.

21  Roland Chang, on behalf of Rogelio Real, who is present and in

22  custody.

23          **THE COURT:**  All right.  Thank you, Mr. Real.

24          **MR. BAYS:**  Good afternoon, Your Honor.  Nathan Bays,

25  on behalf of Ignacio Cruz, who is present, in custody, in the

1   second row.

2           **THE COURT:**  All right.  Thank you.

3       Good afternoon, Mr. Cruz.

4           **MS. BARAY:**  Good afternoon, Your Honor.

5   Camellia Baray, appearing for Mr. Nathan, who is presently in

6   custody, and standing in the back row.

7           **THE COURT:**  All right.  Good afternoon, Mr. Nathan.

8           **MR. OSTERHOUDT:**  Good afternoon, Your Honor.

9   William Osterhoudt.  I'm appearing with Martin Sabelli on

10  behalf of Jairo Hernandez, who's present.

11          **THE COURT:**  All right.  Thank you, Mr. Hernandez.

12          **MR. SABELLI:**  Good afternoon.  Martin Sabelli,

13  together with Mr. Osterhoudt, representing Mr. Hernandez.

14      Also, Your Honor, Ms. Pollock has asked us to stand in for

15  Mr. Garcia-Gomez, who's in the front row.

16          **THE COURT:**  Thank you, Mr. Garcia-Gomez.

17          **MR. SABELLI:**  And Mr. Glenn has asked us to stand in

18  for Mr. Cruz [sic], who is in the second row, Your Honor.

19          **THE COURT:**  All right.

20          **MS. LEE:**  I'm sorry.  Mr. Salinas.

21          **THE CLERK:**  Cid-Cruz?

22          **MR. SABELLI:**  Mr. Salinas.  Thank you.

23          **THE COURT:**  Mr. Salinas?

24          **MR. SABELLI:**  Yes, Your Honor.

25          **THE COURT:**  All right.  Good afternoon, Mr. Salinas.

1          **MR. SABELLI:**  Thank you.

2          **THE CLERK:**  We also need to verify the name; his true

3   name.  The record has "Cid-Cruz."

4          **MR. SCOBLE:**  Cid, C-i-d, hyphen, Salinas.

5          **THE CLERK:**  Salinas?  Okay.  Salinas.

6          **MR. SCOBLE:**  Thank you.

7          **INTERPRETER:**  And Melinda Basker, Spanish

8   interpreter -- I have been sworn -- for Mr. Salinas.

9          **THE COURT:**  All right.  Good afternoon again,

10  everyone.  So I'd like to get a sense -- and I appreciate the

11  status report from the Government.  And I want to hear from all

12  sides where we're going, in terms of time frame and the next

13  steps.

14     So the first question is with respect to death-penalty

15  eligibility.  I understand that the Government is proceeding.

16  Maybe you can give me a more specific update as to what the

17  process is.

18          **MR. SCOBLE:**  That's correct, Your Honor.  We've

19  started the internal procedure here.  It has to be decided

20  first in our Office.  And then it goes back to the Capital

21  Crimes Section, and ultimately gets the approval or disapproval

22  of the Attorney General.  We're starting that procedure -- have

23  started that procedure.  It's under an actually fairly new,

24  expedited procedure.  I can't promise a specific amount of

25  time.  In my past cases, I've seen it take as long as 60 to 90

1  days; sometimes more like 120; but at any rate, we are moving

2  on that.

3      The significance of the expedited procedure is it doesn't

4  require waiting for a Defense presentation, which they're

5  certainly entitled to before the Government ever indicates that

6  it wants to seek the death penalty.  I think that's a fair --

7  fair way to put it.

8          **THE COURT:**  So tell me the process in this case

9  you're contemplating, then, if there's a --

10          **MR. SCOBLE:**  There's an internal write-up which we

11  have to complete still.  The U.S. Attorney signs it.  It goes

12  back to the Capital Crimes Section.  They will look at it, and

13  then essentially make a recommendation that goes up the chain

14  from there.  So it's -- it's a somewhat quick -- well, it is a

15  quicker procedure from what used to be in place.

16          **THE COURT:**  All right, but the outcome --

17          **MR. SCOBLE:**  I'm reluctant to say it's 30 or 60 days.

18  It may well take more than 60 days, but at any rate --

19          **THE COURT:**  That's the local stage?

20          **MR. SCOBLE:**  We're -- at the moment, we're in the

21  local stage still.  Yes.

22          **THE COURT:**  But when you say "possibly 60 to 90

23  days," or something along those lines --

24          **MR. SCOBLE:**  For the entire procedure, because

25  ultimately what happens is U.S. Attorney makes a

1  recommendation.  The Capital Crimes Section looks at it, and
2  either agrees or disagrees.
3      Assuming they agree it, then goes up the chain from there.
4  And once there's a final approval of that, that gets
5  communicated to U.S. Attorney.  And at that point, if,
6  hypothetically, it's for authorization not to seek the death
7  penalty, then the Government files a notice with the Court,
8  saying we are -- we are notifying the Court and parties that
9  we're not seeking the death penalty.
10          **THE COURT:**  And if the conclusion is to the
11  contrary --
12          **MR. SCOBLE:**  Then it's a much more protracted
13  procedure.
14          **THE COURT:**  That's the point where counsel would
15  then -- defense counsel would then be able to make their
16  presentation?
17          **MR. SCOBLE:**  Yes.  Yes.  And I think it's a much
18  longer procedure, but we'll -- we'll hope that we can avoid
19  that.
20          **MR. SABELLI:**  Not speaking for Mr. Vasquez, but
21  speaking for Mr. Hernandez, that's our understanding.  However,
22  we do have learned counsel now, and are proceeding in
23  preparation for making mitigation presentation, in the event
24  that that's necessary.  We don't want to lose time in that
25  respect, Your Honor.

 1           **MR. SCOBLE:**  And that's fine.

 2           **MS. MITCHELL:**  And, Your Honor, speaking on behalf of

 3    Mr. Vasquez --

 4           **THE REPORTER:**  I'm sorry.  Who's speaking?  Oh.

 5           **MS. MITCHELL:**  Speaking on behalf of Mr. Vasquez, I

 6    would indicate that we're in the same procedure.

 7           **MR. SCOBLE:**  Yeah.  I believe the docket reflects

 8    that John Philipsborn has been appointed as learned counsel for

 9    Mr. Vasquez.

10           **THE COURT:**  All right.  So it is may be that defense

11    presentation might be obviated, depending on what the decision

12    is.  And if the decision is to seek death, then we'll go into

13    the more protracted process --

14           **MR. SCOBLE:**  Yes.

15           **THE COURT:**  -- which is --

16        And how long does that process take these days?

17           **MR. SCOBLE:**  I haven't personally been in that

18    process in any case I've done.  I think the last time that I'm

19    aware of it being in our District was with -- I think it was

20    the Page Street Mob case, *Dennis Cyrus*.  I'm not sure.  I'm

21    going to guess it's a year, at least.

22           **THE COURT:**  Okay.  All right.  So you think if we

23    return here, let's say, in 90 days, you'll have a good sense,

24    perhaps, at that point?

25           **MR. SCOBLE:**  I think so.

1      **THE COURT:**  All right.  Any other comments from

2   defense counsel on the death-eligibility question?

3      **MR. SABELLI:**  Solely on that issue, no, Your Honor.

4   In our experience, it's been a long process.  And it depends on

5   the nature of the mitigation investigation, which is something

6   that we can't share here in open court; but six months is --

7   you know, it would be very quick.  And I've seen it go and my

8   co-counsel has seen it go a long lot longer than that -- a year

9   or more -- but that will depend on issues which I can't address

10  in open court.

11     **THE COURT:**  Okay.

12     **MR. SABELLI:**  Your Honor, may I?  Your Honor

13  addressed earlier having seen a Government status report.  Did

14  the Government receive our status report, as well?

15     **THE COURT:**  No, I did not.

16     **MR. SABELLI:**  We filed one yesterday at about 5:30.

17  It's Docket 94.  It's 11 pages long, Your Honor.

18     **THE COURT:**  You didn't file a chambers copy, I take

19  it; just electronically filed?

20     **MR. SABELLI:**  We did, Your Honor.

21     **THE CLERK:**  I haven't seen it.

22     **MS. MITCHELL:**  If the Court needs a copy --

23     **MR. SCOBLE:**  I have a copy.

24     **THE COURT:**  All right.  Can I get a copy, then?

25  (Whereupon a document was tendered to the Court.)

1              THE COURT:  And maybe at this point you can raise

2    with me the issues that need to be raised.

3              MR. SCOBLE:  Your Honor, I don't think I wrote on

4    that.  Maybe you should just double check that.  I believe

5    that's a clean copy.

6              THE COURT:  Do you waive any attorney-client

7    privilege?

8              MR. SCOBLE:  Yes.  I just didn't want to influence

9    the Court unfairly in either direction.

10             THE COURT:  Okay.  This one's clean.

11             MR. SCOBLE:  Okay.  Good.

12             THE COURT:  Well, let me first key off of the

13   Government's report, because unfortunately I did not review

14   Defense.  I just need to get things in order.

15        Is there any more I should know or we need to discuss with

16   respect to death-penalty eligibility at this point?

17             MR. SABELLI:  No, Your Honor.

18             MS. MITCHELL:  No, Your Honor.

19             MR. SCOBLE:  I think that's complete on that issue.

20             THE COURT:  All right.  The Government has raised the

21   possibility of future superseding indictment.  And I'm clear

22   where it says that they'd be able to determine this issue

23   within a three- to six-month time frame originally provided by

24   Judge Breyer three months ago.

25             MS. LEE:  A month and a half ago, Your Honor.  Our

1  last appearance in front of Judge Breyer was April 23rd, 2014;

2  so it was about a month and a half, two months ago.

3          **THE COURT:**  Two months ago.

4          **MS. LEE:**  Two months ago.

5          **MR. SCOBLE:**  I think that is still a reasonable

6  estimate.

7          **INTERPRETER:**  The interpreter cannot hear,

8  Mr. Scoble.

9          **MR. SCOBLE:**  Sorry.  I think that is still a

10  reasonable estimate.

11          **THE COURT:**  All right.  So the anticipation -- if

12  we're leading to a place where we're going to have a further

13  status conference, let's say, in 90 days, we'll also have a

14  good fix on superseding indictment or not at that point?

15          **MS. LEE:**  Yes, Your Honor.

16          **MR. SCOBLE:**  Yes.

17          **THE COURT:**  All right.  The Government has also

18  raised a question about the unsealing of the state wiretap,

19  Maybe you can give me an up an date as to what the process and

20  how long the process is going to take.

21          **MS. LEE:**  Sure, Your Honor.  So it's a state wiretap.

22  All defense counsel are aware that it exists, and that we are

23  in the process of --

24      Well, it's not actually up to us to unseal it, because it

25  is a state wiretap.  So the process to get it unsealed is for

us to make a request with the San Francisco DA's Office, which
we have done with an Assistant District Attorney there.  And
they are -- they have communicated to us that they have started
the process of unsealing it.

     Unfortunately, it's not something that is directly in our
hands.  It's indirectly in our hands.  In other words, we can
do what we've done, which is make the request, and keep
pressure on them to get it done quickly.  I was told is by the
ADA that it takes -- it's not a lengthy process; that it can be
done in two weeks.

     I don't know -- I honestly think that the -- the reason why
it hasn't been done yet is that the SFPD officer who would be
the one that would have to be involved in helping unseal it is
recovering from eye surgery, and he hasn't been in the office
in the past two weeks.

     So -- but it -- the process has been started.  And I --
we're confident it can be done quickly.  And the moment that it
is unsealed, as stated in the status statement, we will produce
the audio.  And any transcripts and/or logs and reports we will
just have to review, and take some time to redact.

          **THE COURT:**  How long do you expect that will take
your office to do, once you get it?

          **MS. LEE:**  Well, that's the thing, Your Honor.  Since
Mr. Scoble and I don't know what the state wiretap -- we walled
ourselves off of it, so we don't know what is in that state

wiretap.  And we did that on purpose, because we didn't want to

be influenced by it in indicting this case in any way, shape,

or form.

So once it is unsealed and we take a look at it, at that

point, we'll know.  We're both pretty quick redacters, as

evidenced by the fact that we've produced 5,888 pages of

discovery that we have personally -- the majority of which we

redacted ourselves.  So -- but I can't give a time -- a

specific time frame.

**MR. SCOBLE:**  Your Honor, I would anticipate that

audio of calls can be expeditiously dubbed off, sent over to

Colour Drop.  Same thing with line sheets.

The trickier question would be the affidavit.  That --

that's what I think raises the issue for Ms. Lee and me, is

whether there's anything that we feel needs to be redacted for

purposes of witness or informant security.

**THE COURT:**  All right.  Well, what I'd like is a

report 30 days from now from the Government as to the status of

that; whether you've gotten the coöperation of the DAs, and

have that.  And if it's not been -- and what the time frame is

if it hasn't already been produced to defense counsel.

And let me hear any comments from the defense side on this

issue.

**MR. BALOGH:**  I note the Court's being incredibly

generous.  I'd make a few points.  We were here six weeks ago,

when the Government was -- started the process that takes two

weeks, and the process isn't completed.

I disagree conceptually with the notion that either my

colleagues are powerless to get it, because, as this Court

knows, under Rule 16 discovery, since it's due upon request,

all we need is a date certain of a preclusion order, or the

exclusion of evidence, and we will see all of the evidence the

Government wants to allow in the trial promptly produced before

that date.  So I think this Court has ample ability to motivate

our friends at SFPD to get whatever inculpatory evidence they'd

like to use at our trials.

I'm concerned about this notion of redacting audio reports

and logs, because, if I understand how a wiretap works, it's

our clients allegedly making inculpatory statements.  And they

know what they've stated.  So redacting from them what they've

said on a wiretap -- I'm not understanding what sensitive

information they shared amongst themselves in surreptitiously

recorded conversations that now we have to withhold from them.

With respect to redacting affidavits for our clients'

concerns, I think that maybe the Government may have some --

some traction there; but under T3 for a T3 wire, the defense

lawyers are entitled to completely unredacted reports; and

we're going to stand on that right.  I'd be happy to brief it

for you.  I just finished a brief on it, so I'm fairly up on

it.

1           **THE COURT:**  So under protective order for attorneys'

2    eyes only, I guess?

3           **MR. BALOGH:**  I think, obviously, electronic

4    surveillance is going to be a critical part of the Government's

5    case, is my anticipation.  And we're going to need to assess

6    whether we have a challenge to it.  So redacting of the

7    probable-cause showing and the necessity showing to allow the

8    introduction of that evidence in court is going to require

9    unfettered review by counsel, at a minimum.

10          **THE COURT:**  All right.

11          **MR. BALOGH:**  Those are my comments, Your Honor.

12          **THE COURT:**  Let me ask the Government about the

13   timing, and sort of tolerating sort of a long, slow or slower

14   effort than might otherwise be available from the DA's Office.

15          **MR. SCOBLE:**  Sure.  Let me address two points first.

16     I think Counsel misheard me.  We're not talking about

17   redacting audio or line sheets.  Those are the ones that I

18   singled out as -- I don't see that there would be any

19   redaction.  So I think those can be produced and sent out

20   directly.

21     It's the affidavit or affidavits, plural.  I don't know

22   whether there's one, or whether there's more, or how long they

23   are.  Those would be the witness ones, where we would have the

24   concerns about protecting the identity and safety of witnesses,

25   civilian witnesses and/or confidential informants.

 1       In terms of how quickly to move on this, frankly, I
 2  would -- I would prioritize this as perhaps a lower project
 3  than the incident reports, which I think more counsel want us
 4  to get out quickly.  If -- if we should reverse that, that's
 5  fine.  We'll work on that, instead.
 6           **THE COURT:**  Well, all right.  I'm going to adhere to
 7  my requirement to the 30-day report on the status of the
 8  wiretap materials.
 9           **MR. SABELLI:**  Your Honor, may I address this issue
10  before the Court rules finally?
11           **THE COURT:**  Yeah.
12           **MR. SABELLI:**  I'd like to make a smaller point with
13  respect to the wiretap affidavits, and then a larger point with
14  respect to discovery, because I think this particular dispute
15  should be seen in the context of the larger set of issues.
16       With respect to the wiretap and the wiretap affidavits, I
17  understand that -- that these two individual lawyers have
18  walled themselves from that material.  And that's fine.  And we
19  accept that representation.  And we understand that there's
20  some governmental logic to that -- to that process.
21       However, the wiretap materials from the State have been
22  part of the universe of facts that have been used in obtaining
23  some of the Federal search warrants, from what we can tell from
24  the search-warrant production that was made last week.  And it
25  certainly has been material that has been used and relied upon

1  by the San Francisco Police Department gang experts that are

2  part of the Government effort here in Federal Court.

3      So while it is true that these two lawyers, Ms. Lee and

4  Mr. Scoble, have not reviewed it for those -- for the purposes

5  that Ms. Lee set forth, it is not quite right -- it doesn't sit

6  quite right with me to say that the Government hasn't had

7  access to these things.

8      And that's a way of backing into the larger issue.  The

9  larger issue is this -- and Mr. Balogh raised it eloquently at

10 our first hearing.  And when the Court sees our papers, it will

11 see how we've laid it forth as part of a joint representation

12 or statement.  And that is that these folks -- these

13 defendants -- were indicted a while ago; three, three and a

14 half months ago.  And since then, we've received approximately

15 5,800 pages of discovery, most of which we consider to be

16 tangential.

17     And the Government's position is it's not tangential; that

18 it's all necessary in order to understand the RICO enterprise.

19 And that's true, but in these cases -- these cases are really

20 about what each person is accused to have done:  To have joined

21 and participated in and furthered the RICO enterprise.

22     Sure, there's an element of:  Does this RICO enterprise

23 exist?

24     But each of these individuals is accused of participating

25 in substantive crimes and certain acts.  And what we are

1   absolutely lacking, Your Honor, is the evidence and discovery

2   related to the particular acts alleged and the particular

3   substantive crimes alleged for everybody who is sitting at my

4   left.

5       We essentially have material that relates to three of

6   the -- I don't know how many hundreds or dozens or, if not,

7   hundreds of incidents.  One -- three stabbings, essentially.

8       Mr. Wine, for example.  Ken Wine, who represents

9   Mr. Chavez -- his client is accused of four attempted murders;

10  and he has the equivalent of a page and a half San Francisco

11  Police Report on that.  That is -- that is on the high end of

12  the volume of discovery we have.

13      With respect to Mr. Hernandez, Mr. Jairo Hernandez, who I

14  represent, and Mr. Vasquez, who is charged in the same Counts,

15  Five and Six, which are the death-eligible counts, we don't

16  have anything at all from the San Francisco Police Department

17  on what our client are alleged to have done.  Did they hold a

18  gun?  You know.  Were they the driver?  Were they the shot

19  caller?

20      We have some theories about what the Government's theories

21  are, but that's what they are at this point.  We don't have the

22  material.

23      And typically, Your Honor, in these cases what happens is

24  we get that kind of discovery up front, so that we can build a

25  relationship with our clients, so that we can give our

1    investigators something to go on, so we can develop a

2    litigation plan, so we can develop defense theories, and we can

3    do some meaningful work.

4        What each of us have -- have concluded -- each of us

5    defense counsel here -- and what I tried to express in the

6    paper -- and, in fact, I'm going to urge the Court to take a

7    few minutes and look at it before we proceed -- is that we

8    can't do any meaningful work.  The time excluded thus far has

9    essentially allowed the Government to redact what we consider

10   to be tangential discovery; sit on the discovery -- not

11   intentionally.  I'm not accusing anybody of doing anything

12   intentionally -- but keeping back the discovery that is really

13   what we need to work on, and what historically in this District

14   has come first.  And historically --

15             THE COURT:  How would you sum up?  If you could

16   itemize the things that have not been produced that need to be

17   produced posthaste, what would they be?

18             MR. SABELLI:  The -- the -- what Government counsel

19   calls the "specific" -- the incident-specific Police Reports.

20   That's what we usually get right up front, with some

21   redactions.

22       And what usually happens -- historically happens in this

23   District, I mean, and in other Districts -- is the Government

24   says, "We can't give you everything.  We've got to redact some

25   things.  We're worried about witness safety, so we're going to

1  ask for a protective order."

2      And what the Government hasn't done in this case is to ask

3  for a protective order.  Instead, they've held back all of

4  the -- all of the material that we think and that typically is

5  given over in the first steps, in the first phases of the

6  process, to give us a sense of the case against each client.

7      Sure, we have the sense of what the big case looks like.

8  This is a RICO case.

9      But what my client is alleged to have done, I don't know;

10  nor does Mr. Wine, nor does anybody else here, except by

11  reading in between the lines.  And I have a little bit more

12  sense of it, as of June 5th, last week, when we received some

13  of the search warrant application materials, but we don't have

14  the underlying reports.

15      And so, Your Honor, what -- what -- the point I was

16  starting to make when I went off a little bit was that

17  typically, the Government will ask for protective order; will

18  bring the safety concerns to the Court's attention and say,

19  "Look.  We've got some concerns here."  And that is negotiated

20  with the defense, and litigated if necessary.  That has not

21  happened here.  The Government has not said to the Court, "We

22  have safety concerns.  We are asking for a protective order."

23  Instead, they've simply said, "We're not going to give any of

24  it over for now."  And that puts us as a tremendous

25  disadvantage.

1     One thing that the Court might see is some strained

2   relationships between defense counsel and their clients,

3   because you can't build a relationship with a client when you

4   keep telling them, "We don't have anything.  We don't know what

5   your case is about yet."

6        **THE COURT:**  All right.  So in addition to

7   incident-specific Police Reports, is there another large

8   category of documents?

9        **MR. SABELLI:**  Yes, Your Honor.  And they're set

10  forth.  They're enumerated.  That's the most important.  And

11  that's what we would want up front.

12     The categories are set forth starting on page 7 of our

13  status report.

14     And let me tell the Court what the Defense decided jointly

15  to propose, because we have established a joint defense.  And

16  we've met and discussed.  And we have a proposal that might

17  make it easier for everybody here to be able to address these

18  issues in a comprehensive and systematic way.

19     Right now, we feel that we're throwing punches in the dark,

20  because we really don't know everything that's out there.  Our

21  proposal is that the Government produce an index.  We've made

22  this request to the Government.  We want to know what's

23  missing.  We're proposing that the Government produce an index

24  of the discovery material in its possession; turn it over to

25  the Court and counsel within a reasonable period of time.  We

1  think seven days should be sufficient time to do that.  And

2  I've raised this with the Government, as well.

3      And then we all come back here in two weeks.  And once we

4  know exactly what we're missing, we can tell the Court.  We can

5  establish a schedule with the Government.

6      And the Government should propose, by the way, a schedule

7  and its index.  The Government would give us an index and a

8  proposed schedule.

9      And then we can come back.  And perhaps we can modify that

10  schedule.  We can agree to the Government modifications on this

11  schedule.  Perhaps not.  But where we disagree, we can

12  litigate.  Where we agree, we can stipulate.  And we could end

13  up saving a lot of time and effort by stipulating to what can

14  be stipulated to, and litigating what can be litigated; rather

15  than sitting on our heals for another 90 days.

16      I mean, the prospect of sitting back and waiting for those

17  San Francisco Police reports for another 90 days essentially

18  means we're going to be sitting around with six or seven months

19  without really being able to do any serious investigation.

20  That puts us at a tremendous disadvantage.  These cases -- you

21  know, the trails on finding people and talking to people --

22  they get cold.  And that's what's happening to us right now,

23  Your Honor.  And the Court should consider the fact that the

24  Government indicted.  And before they indicted, they had a

25  chance to put -- you know, put some of this stuff together,

1  including getting a State wiretaps together.  None of this had

2  to have been done after indictment.

3      So the Defense respects the fact that the Government is --

4  is putting a lot of time and effort into this, but we'd

5  strongly disagree with the way the Government has prioritized

6  the discovery in this case, and are raising for the Court what

7  we consider to be very practical and constitutional concerns

8  about not being able to do our job right.  That's the problem

9  we have.

10          **MS. LEE:**  Your Honor, may I respond?

11          **THE COURT:**  Yeah.

12          **MS. LEE:**  Okay.  I'm going to address, hopefully in

13  chronological order, the things that Mr. Sabelli brought up.

14      First of all, Mr. Scoble and I do disagree with what he

15  describes as to the documents that have been produced.  So as

16  of this date, in a month and a half, we've produced, as we

17  stated, 5,888 pages of discovery.

18          **THE COURT:**  What about the Police Reports?  What

19  about the incident-specific Police Reports?

20          **MS. LEE:**  Yes.  In regard to the SFPD Incident

21  Reports, as Mr. Sabelli points out in his own Defense memo, in

22  the footnote, I believe, on page 2, the Defense has received

23  HSI Reports related to three substantively charged incidents

24  within the RICO VICAR indictment:  Specifically, the Nizario

25  Pizza assault and stabbing; the Taqueria El Castillito assault

1   and stabbing; and the January 4th, 2014, assault and stabbing.

2   So I would point Mr. Sabelli to his very own Defense memo,

3   which states that we have actually produced SFPD Incident

4   Reports and HSI ROIs that relate to three out of the five

5   charged incidents in this RICO VICAR indictment.  So to say

6   that we have not produced SFPD Incident Reports that relate to

7   the charged crimes is just not -- it's categorically untrue.

8            THE COURT:  He's asking for a complete set.

9            MS. LEE:  And I understand that, Your Honor.  And I'm

10  sorry that Mr. Sabelli doesn't like the way we produced 5,888

11  pages of documents.  Mr. Scoble and I have taken great care in

12  producing the discovery in an organized and timely fashion.

13       I would also --

14            THE COURT:  How many more Police Reports are

15  responsive to the category as described by Mr. Sabelli?

16            MS. LEE:  I would say several thousands, at least.

17            MR. SCOBLE:  Pages.

18            THE COURT:  Thousands of pages?

19            MS. LEE:  Pages.  Pages.  Yeah.  Yes, Your Honor.

20            MR. SCOBLE:  If he's talking about the full panoply

21  of forensic reports and CSI reports that may be attached to

22  those -- typically, SFPD keeps those in separate places.  So

23  we -- we certainly have started producing discovery -- three of

24  the items in it, so far -- to give them a sense of what it is

25  that the gist of the allegation is.

1      For a complete report -- a complete set of the reports --

2   that may take us weeks to get that together.

3          **MS. LEE:**  I will tell the Court that the next -- the

4   next item on our list that we were going to produce to Defense

5   counsel was -- as we told Mr. Sabelli, were the SFPD Incident

6   Reports related to the murder, because that's what Mr. Sabelli

7   told us was the most important at this point.  And I would

8   agree.  That should be the thing that is produced next.

9      I would say that Mr. Scoble and my time, for that matter,

10  in the next two weeks would be better spent reading, reviewing,

11  and redacting and Bates stamping the approximately -- at least,

12  as of now -- 400 pages of SFPD Incident Reports related to the

13  death-penalty-eligible murder, so that they will have that by

14  the end of next week, than it would be for us to sit in a room

15  and come up with a log of all of the discovery in this case,

16  and another log of all of the discovery we don't plan to

17  produce.  I think that that makes no sense for us to spend our

18  time working on a log of what we're not going to produce, not

19  to mention neither log --

20         **THE COURT:**  But the problem is if we don't have some

21  kind of log and a timetable, then it's all in your court.  And

22  we have to sit here.  And you come back to, well, I've been

23  very busy.  I couldn't get past this 400.  And I've got

24  thousands more to go.  I have no idea how relevant they are.

25  They have no idea what incidents are covered; what documents

1  are available; and no sense of the time frame.  And that's just

2  one slice of everything else that appears.

3         **MS. LEE:**  Just to put this in the right perspective,

4  Your Honor, I would point out for the Court that the majority

5  of the items in the Defense's statement that they demand are

6  things that we don't even have to produce under Rule 16.  So to

7  set the landscape on the correct premise here, the items that

8  they are requesting in short order all at once right now are

9  things that they are not even entitled to, but are things that

10 we have voluntarily agreed to produce.

11    So I find it a bit odd that we're fighting over things that

12 are not even --

13        **THE COURT:**  That's not the culture of this District,

14 to limit -- if you want to play that game, you know, we can

15 play that game; but I can set this for trial real early, and

16 make you disclose.  So we're not going to go down that road.

17        **MS. LEE:**  That is correct, Your Honor.

18        **THE COURT:**  I don't frankly care.  I want to do this

19 in the right way.  And I want to give you a reasonable amount

20 of time, but not have the thing dragging on forever.  This case

21 has now been pending for two months, and I want to see some

22 movement in this.  And it sounds like you all haven't actually

23 sat down and met and conferred about your proposal, and your

24 reaction to your proposal.

25        **MR. SCOBLE:**  Well, the proposal for a discovery log

1  we got today before this hearing started.

2         **MR. SABELLI:**  Well, we have sat down and met as part

3  of the Discovery Committee.  Ms. Pollock, Mr. Wine, Mr. Morley,

4  and Ms. Mitchell and I have sat down.  We requested that we be

5  given a list of materials that were not -- have not been turned

6  over.

7      Today, before court, I let them know about the decision

8  about the 7- and 14-day schedule that we just decided about an

9  hour ago -- the Defense side decided about.

10     So we've made the request for materials that have not been

11 turned over.  And today, we formed -- the Defense formally

12 requested that be done in a 7- and 14-day staged process, so we

13 get -- we get --

14        **THE COURT:**  Well, it's hard for me, especially if

15 they haven't had a chance to react to 7, 14.  I don't know what

16 the volume is.

17     Doesn't it make sense to sit down and talk about

18 priorities, for one thing?

19     And it may be that within the next several thousand pages,

20 whether it's the murder incidents or some other things, some

21 way of prioritizing --

22     And it may be that it is important, in order to set up for

23 adjudication and decision, a log process, so that we can

24 decide, you know; so I can see what the universe is.  If

25 there's a dispute over sequencing, timing, I have some sense.

1  Because right now I have -- I have nothing, other than a

2  general description that "There are thousands more pages," and

3  your description that, "We know nothing but five pages on this

4  incident."

5      **MR. SABELLI:**  Your Honor is exactly right.  And that

6  is exactly why we need to have that log:  Because right now,

7  the only folks who know who's out there is the Government.

8      And -- and so I've got a couple of points to make on this.

9  The first point is:  We don't know what's out there.  So to

10  have -- for us to have a meaningful discussion with the

11  Government -- and we've had discussions.  We've sat down.  And

12  we intend to do so.  The Government counsel have been very

13  available.  We know they've been working very hard.  So our

14  dispute is not in any way directed at them.  We know they're

15  working hard; but we can't really have an intelligent

16  conversation without knowing what's out there, so -- and

17  neither can the Court.  The Court doesn't know what's out

18  there, either.

19      So that is why we're asking the Government, as a very first

20  step -- and we've asked for it before -- to let us know what we

21  don't have, and then propose a schedule for turning it over.

22      Then we can have a discussion with the Government where we

23  disagree with their schedule.

24      The problem, of course, Your Honor, is, as the Court

25  intuited or analyzed a few minutes ago, really -- that is that

1   we have the -- we've been sitting on our heels.  And the entire

2   control is in the Government's hands.

3       And it's hard to say "No" to two eloquent counsel when they

4   say, "Look.  We're working hard.  Our time would be better

5   spent in the next two weeks getting the Defense the Reports."

6   That's all very true, but when -- when -- in the context of

7   already being over three months down the line in this case, and

8   not getting what we ordinarily get in the first month so that

9   we know what's going on -- that makes it hard for us to deal

10  with our clients.  It makes it impossible for us to do any kind

11  of Defense investigation and develop a litigation plan.

12      So while I take Ms. Lee and Mr. Scoble at their word --

13  I've worked with them before, especially Mr. Scoble, in other

14  cases.  Ms. Lee -- I'm new to her.  I understand they're both

15  very committed counsel.  That's not the issue.

16      But the way the Government has gone about giving us

17  discovery in this case makes it impossible for us to work.  And

18  the only way that we see it possible for us to work and for the

19  Court to react is for us to get a sense of what the Government

20  has and doesn't have, and then their proposed schedule.  We

21  don't know what's out there.

22      And, by the way, with respect to Ms. Lee's point that we're

23  asking for things we're not entitled to -- that bleeds into an

24  entirely different conversation, which is the relationship of

25  the -- of the U.S. Attorney's Office with the San Francisco

1    Police Department, which is a major issue of dispute between

2    the parties, which we hadn't intended to raise today, but we

3    will raise at some point.

4        The question is:  Is the San Francisco Police Department an

5    investigative agency -- or not -- for the Feds?

6        And we have pressed that issue with the Government.

7        The Government's given us an answer that we think is

8    inconclusive.  And we've told the Government we think it's an

9    inconclusive answer.  We don't think it's a clear-enough

10   answer.  I can lay that out for the Court, if the Court wants;

11   or we can save that for another day.

12             **THE COURT:**  Well, we may or may not have to get

13   there, depending on, you know, whether we can get on schedule

14   here and agree upon a sequence and time frame for production.

15       And so I think it would be fruitful, frankly, for the

16   parties to meet and confer specifically about your proposal,

17   because you just came up with it, as you say, an hour ago.  And

18   I'd like the parties to meet and confer, with guidance from

19   this Court, that I do want to see some concrete time lines, and

20   a process that we can agree to.

21       If you can't agree to it, then I'll adjudicate.  And that

22   does mean some prioritization of categories of documents,

23   because they can't -- you know, there's a lot here.  And it's

24   not all going to happen overnight.  Prioritize it and sequence

25   these things in a way that makes coherent sense and gets the

1  maximum value out of it early on.

2        MR. SABELLI:  Your Honor, there's intracase

3  prioritization, and intercase prioritization.

4     In other words, part of the issue is:  How -- how -- and I

5  don't know the answer to this.  How much is the Government --

6  how many -- what resources is the Government putting into

7  producing these things?

8     When I hear, "We haven't gotten the State Police Reports

9  because the SFPD guy has been out for a few weeks," I know that

10  that's not Ms. Lee's fault.  I know that that's not

11  Mr. Scoble's fault.  But you know, when -- if we're entitled to

12  something, the answer can't be, "Well, nobody can get to it."

13  Somebody's got to get to it.  You know, we can't have guys in

14  custody for this period of time, without getting the things

15  that we're entitled to.

16        THE COURT:  Well, that's why I'm asking for you to

17  sit down and meet and confer:  To talk about things, and come

18  up with a priority.

19        MR. SABELLI:  I agree.

20        THE COURT:  Proposed priority.

21     And to the extent that there's some dispute about whether

22  something can be gotten or you're not able to, or there's some

23  problem, I can adjudicate that and take whatever steps I deem

24  necessary to make it happen.

25     But right now it needs to be teed up.

1          **MR. SABELLI:**  I agree with that.  We need a list in

2    order for everybody here to have an intelligent conversation.

3          And part of that conversation -- this is my last point,

4    Your Honor -- is there should be some discussion of whether or

5    not the Government is going to request a protective order,

6    because that's typical in this District.  It's typical in other

7    Districts.

8          And what's happened in this case is essentially the

9    Government says, "We've got safety concerns.  We can't give you

10   things, but we are not requesting a protective order yet."

11         **THE COURT:**  That's one the things I expect you to

12   meet and confer about, is whether or not -- short of, you know,

13   positions of nonproduction or full production, whether there

14   can be a protective order put in place to facilitate at least

15   some if not all the production, and narrow that range, so at

16   least counsel can have time to prepare.

17         **MR. SCOBLE:**  And that's fine.

18         Counsel has talked about general practice in this District.

19   I'm somewhat familiar with the *Cerna* case -- the MS-13 case --

20   which is, in fact, factually linked to this case, as it turns

21   out.  It's my understanding from the docket sheet that there

22   was not a protective order entered until a year after that case

23   had been indicted.  So just so we talk about general practice

24   with multidefendant cases that are racketeering in this

25   District, I'm not aware of any case where production is full

after three and a half months from indictment, and where the protective order's in place.

        **THE COURT:** I understand this is a big case.

        **MR. SCOBLE:** We're happy to work on it. We're happy to get prioritized. Fine. And we'll do that, consistent with our obligations to ensure witness and informant safety.

        **THE COURT:** Well, I'd like that to be a topic of the meet-and-confer.

        **MR. SCOBLE:** Sure.

        **THE COURT:** And that --

        **MR. SABELLI:** That works.

        **MR. SCOBLE:** Yeah.

        **THE COURT:** Maybe you can agree conceptually -- and hopefully, practically -- about a disclosure process. And if it includes a protective order, that's something that should be discussed.

    What I think I'd like to do is for the parties to meet and confer over the next seven days or so.

    We'll come back here in 14 days.

    Proceed with a joint letter. Let me know if you come up with a plan; or if you don't, if you have some disagreements on the specific things, then we can discuss that and hone that down, and try to come up -- leave that conference with something very concrete.

    In the meantime, I do expect the discovery to continue;

```
 1   particularly the State wiretap stuff.  That really -- I really
 2   don't see much reason why that should take much longer.  I'd
 3   like the process to continue, but I want this meet-and-confer
 4   to occur over the next week or so.  A week or ten days.  Get me
 5   a joint letter at least a day or two before.  And let's set
 6   time to come back in 14 days.
 7            MR. SABELLI:  Fourteen, or whatever is convenient to
 8   the Court and counsel.
 9            THE COURT:  25th of June here in this courtroom at
10   2:00 o'clock.  All right?  And if you can, get me a joint
11   letter by Monday --
12            MR. BALOGH:  Absolutely, Your Honor.
13            THE COURT:  -- to let me know what the status is.
14            MR. SABELLI:  That sounds good.
15            THE COURT:  See if you can fruitfully meet and
16   confer.
17            MR. SCOBLE:  Twenty-fifth.  The joint letter by the
18   23rd.  Right?
19            MS. LEE:  Oh, okay.
20            MR. SABELLI:  Joint letter by the 23rd.
21            THE COURT:  Two weeks from now, which is the 25th.
22            THE CLERK:  Twenty-fifth.
23            THE COURT:  And if you could do me the favor, if you
24   have something, if you could get a chambers copy to me, just in
25   case you just e-file it, sometimes --
```

1          **MR. SABELLI:**  Yeah.  I understood it had been

2     delivered; and I learned about 15 minutes before the hearing

3     that it had not been.  So my apologies.

4          **THE CLERK:**  What you can do is e-mail me, too, so I

5     know to pick it up.  That will be fine.  Okay?

6          **MR. SABELLI:**  Thank you.

7          **THE CLERK:**  Thanks.

8          **MR. SCOBLE:**  Your Honor, on the issue of speedy

9     trial, I would urge that Judge Breyer was correct in calling

10    this a factually complex case.  I think probably what you've

11    heard today is pretty good evidence of that.

12         **THE COURT:**  Pretty good substantiation of that.  Any

13    objection to designation of this case as complex in -- for

14    speedy-trial purposes?

15         **MR. SABELLI:**  On behalf only of Mr. Hernandez, no

16    objection, given -- particularly because he's death-eligible;

17    but I can't speak for other counsel.

18         **MR. BALOGH:**  I think the position I would take is

19    time should be excluded until the next time for continuity of

20    counsel, and effective preparation.  I don't think, based on

21    the discovery produced to date, any counsel in this room is in

22    a position to agree or disagree with the Government's

23    assessment, because we don't have the information by which we

24    can make that assessment.

25         **THE COURT:**  All right.  Any objection to excluding

1  time until the next calling of the case two weeks from now,

2  from any counsel?

3          **MR. BABCOCK:**  No, Your Honor.

4          **THE COURT:**  All right.  Then I will exclude time on

5  the grounds that time is needed for effective preparation;

6  hence the ends of justice outweigh the public's and the

7  defendants' interests in a speedy trial.  This is without

8  prejudice to possible continuing designation of this case.

9          **MR. SCOBLE:**  Thank you, Your Honor.

10          **MR. SABELLI:**  Thank you very much, Your Honor.

11          **THE COURT:**  All right.

12          **MR. BALOGH:**  Thank you.

13          **THE COURT:**  Wait a minute.

14          **THE CLERK:**  Counsel, one second.  We are not done

15  yet.

16  (Discussion off the record.)

17          **THE COURT:**  This is Judge Illston's?  And there's

18  only that courtroom available?

19          **MR. SCOBLE:**  Couldn't we specially --

20     She's dark on Fridays.

21          **MS. LEE:**  She's dark on Fridays.

22          **U.S. MARSHAL:**  It is dark on Fridays, but --

23          **THE CLERK:**  We can do Friday afternoon.

24          **THE COURT:**  Okay.

25          **MR. SABELLI:**  The 27th?

1          THE COURT:  I guess the 27th.  At 2:00 o'clock?

2          THE CLERK:  2:00 o'clock.

3          MR. BALOGH:  Your Honor, and may have we have the

4  extra two days for our joint letter?

5          THE COURT:  Yep.

6          MR. SCOBLE:  Thank you.

7          THE COURT:  27th back here, pursuant to what I just

8  said.

9          MR. SABELLI:  Thank you very much, Your Honor.

10         MR. BALOGH:  Thank you, Your Honor.

11         THE COURT:  All right.  Thank you.

12  (At 3:09 p.m. the proceedings were adjourned.)

13  I certify that the foregoing is a correct transcript from the

14  record of proceedings in the above-entitled matter.

15

16  *Lydia Zinn* (signature)

17  _____  July 9, 2014
    Signature of Court Reporter/Transcriber    Date
18  Lydia Zinn

19

20

21

22

23

24

25